UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

FILED
CHARLOTTE, NC

APR 2 1 2021

US DISTRICT COURT
WESTERN DISTRICT OF NC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:2l cr 114-KDB |
| | ) | |
| v. | ) | **BILL OF INDICTMENT** |
| | ) | |
| MAURICE KAMGAING | ) | 18 U.S.C. § 1014 |
| | ) | 18 U.S.C. § 1343 |
| | ) | 18 U.S.C. § 1957 |

THE GRAND JURY CHARGES:

At all times material to this Indictment:

## Introduction

1.      Defendant MAURICE KAMGAING submitted and caused to be submitted false and fraudulent PPP loan applications to Bank 1 using false information, including fake revenues and fake employment data. As a result of the fraudulent applications, KAMGAING obtained more than $1.5 million in relief funds that were intended to be provided to existing business harmed by the COVID-19 pandemic.  After receiving the loan proceeds, KAMGAING used the funds for improper expenses and caused the funds to be transferred among various bank accounts.

## Defendant and Related Entities

2.      MAURICE KAMGAING was a resident Charlotte, North Carolina, within the Western District of North Carolina and Archdale, North Carolina, within the Middle District of North Carolina.  KAMGAING had bank accounts at Bank 1, identified herein as KAMGAING Account 7640.  KAMGAING also had a brokerage account at IMC 1 in his own name, identified herein as IMC Account 7700.

3.      Bank 1 was a financial institution headquartered in Charlotte, North Carolina within the Western District of North Carolina whose deposits were insured by the Federal Deposit Insurance Corporation ("FDIC").  Bank 1 was an approved SBA lender of PPP loans and accepted PPP applications through an electronic portal which applicants used to upload documents and information.  Investment Management Company 1 ("IMC 1") was an investing and wealth management division of Bank 1.

4.      On or about September 11, 2008, AKC Solutions LLC ("AKC Solutions") was

1

incorporated in North Carolina. KAMGAING was listed as an Organizer and Member as well as the initial Registered Agent. On or about October 11, 2019, AKC Solutions was administratively dissolved. On or about May 15, 2020, AKC Solutions was reinstated after delinquent annual reports were submitted and filing fees were paid. On that same date, an Annual Report was filed describing the nature of AKC Solutions' business as "Information Technology Services." The Annual Report listed the principal office address as 1305 Rocky River Road West, Charlotte, North Carolina, which was KAMGAING's home address. The Annual Report listed KAMGAING as Registered Agent and President. AKC Solutions had a bank account at Bank 1, identified herein as AKC Account 6241. KAMGAING was listed as the sole authorized person on the account opening documents.

5.    On or about January 16, 2019, Apiagne, Inc. ("Apiagne") was incorporated in North Carolina. According to the Articles of Incorporation, Apiagne's purpose was to "Improve human lives through innovative technology solutions, and to make the world a more peaceful place. Inspire and empower individuals and organizations to lead by example." Apiagne's registered office and the principal office location was listed as 1305 Rocky River Road West, Charlotte, North Carolina, which was KAMGAING's home address. KAMGAING was listed as the Incorporator, initial Registered Agent, and Director. In addition, on the Business Corporation Annual Report filed on or about January 4, 2020, KAMGAING was listed as the President and Chief Executive Officer. Apiagne had a bank account at Bank 1 identified herein as Apiagne Account 7556. KAMGAING was listed as the sole authorized person on the account opening documents. Apiagne also had a brokerage account at IMC 1 identified herein as Apiagne Account 7T50.

### Small Business Administration and Relevant Financial Institutions

6.    The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

7.    As part of this effort, the SBA facilitated loans through banks, credit unions, and other lenders. These loans had government-backed guarantees.

### The Paycheck Protection Program

8.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 designed to provide emergency financial assistance to the millions of American suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

2

9.     In order to obtain a PPP loan, a qualifying business submitted a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan. In the PPP loan application (SBA Form 2483), the small business (through its authorized representative) was required to provide, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

10.     A PPP loan application was processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies. While the lender issued the PPP loan, the SBA provided a guarantee that the financial institution would be reimbursed. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

11.     PPP loan proceeds were required to be used by the business on certain permissible expenses such as payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expenses within a designated period of time and used a defined portion of the PPP loan proceeds on payroll expenses.

## The Purpose of the Scheme to Defraud

12.     The purpose of the scheme to defraud was for KAMGAING to unjustly enrich himself by obtaining PPP loan proceeds under false and misleading pretenses, including by making false statements about the monthly payroll, expenses, employees, and revenues of AKC Solutions and Apiagne.

## Manner and Means of the Scheme to Defraud

13.     The manner and means by which KAMGAING sought to accomplish the objects and purpose of the scheme and artifice included, among others:

### *The Apiagne PPP Application*

14.     On or about April 7, 2020, an application for a $650,000 PPP loan for Apiagne was transmitted through Bank 1's electronic portal. The application falsely represented that Apiagne had an average monthly payroll of $260,000; had 46 employees; was in operation on February 15, 2020; and needed the loan to support its ongoing operations.

15.     As part of the application, KAMGAING electronically signed, and caused to be

3

signed, an Application Addendum on which he identified himself as Apiagne's authorized representative. The Application contained a loan request of $876,540, and KAMGAING falsely certified that "the applicant was in operation on February 15, 2020 and had employees for who it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC."

16.     KAMGAING signed, and caused to be signed, a Bank 1 promissory note, which attested: "Borrower certifies that the information provided in the Application and the information that Borrower provided in all supporting documents and forms is true and accurate in all material respects. Borrower acknowledges that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571."

17.     The Apiagne PPP application included false and fraudulent information about its purported payroll, as well as fraudulent documentation purporting to establish that Apiagne made substantial monthly payroll disbursements. For example:

    a.     The Apiagne PPP application included a false Internal Revenue Service ("IRS") Form 940 signed by KAMGAING purporting to show that, in 2019, Apiagne made $4,111,022 in payments to employees. In fact, no such Form 940 was ever filed with the IRS on behalf of Apiagne; and

    b.     The Apiagne PPP application included a false IRS Form 941 signed by KAMGAING purporting to show that Apiagne paid $901,250.55 in wages to employees during the first quarter of 2020. In fact, no such Form 941 was ever filed with the IRS on behalf of Apiagne.

18.     On or about May 6, 2020, Bank 1 funded the loan by disbursing $856,463 to Apiagne Account 7556. As of May 1, 2020, prior to the receipt of the PPP loan funds, Apiagne Account 7556 had a balance of approximately $100.62.

### The AKC Solutions PPP Application

19.     On or about April 27, 2020, an application for a $650,000 PPP loan for AKC Solutions was transmitted through Bank 1's electronic portal. The application falsely represented that AKC Solutions had an average monthly payroll of $260,000; had 23 employees; was in operation on February 15, 2020; and needed the loan to support its ongoing operations.

20.     As part of the application, KAMGAING electronically signed, and caused to be signed, an Application Addendum on which he identified himself as AKC Solution's authorized representative. The Application contained a loan request of $650,000, and KAMGAING falsely certified that "the applicant was in operation on February 15, 2020 and had employees for who it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC."

4

21.     KAMGAING signed, and caused to be signed, a Bank 1 promissory note, which attested: "Borrower certifies that the information provided in the Application and the information that Borrower provided in all supporting documents and forms is true and accurate in all material respects. Borrower acknowledges that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571."

22.     The AKC Solutions PPP application included false and fraudulent information about its purported payroll, as well as fraudulent documentation purporting to establish that AKC Solutions made substantial monthly payroll disbursements. For example:

        a.     The AKC Solutions PPP application included a false IRS Form 940 signed by KAMGAING purporting to show that, in 2019, AKC Solutions made $3,204,049.34 in payments to employees. In fact, no such Form 940 was ever filed with the IRS on behalf of AKC Solutions.

        b.     The AKC Solutions PPP application included a false IRS Form 941 signed by KAMGAING purporting to show that AKC Solutions paid $801,012.33 in wages to employees during the first quarter of 2020. In fact, no such Form 941 was ever filed with the IRS on behalf of AKC Solutions.

23.     On or about May 5, 2020, Bank 1 funded the loan by disbursing $650,000 to AKC Solutions Account 6241. As of May 1, 2020, prior to the receipt of the PPP loan funds, AKC Solutions Account 6241 had a balance of approximately $100.

24.     After the fraudulent loan proceeds were deposited into AKC Solutions Account 6241 and Apiagne Account 7556, KAMGAING diverted and caused to be diverted some of the fraudulently obtained funds for personal and unauthorized purposes, including but not limited to:

        a.     On or about May 5 and May 6, 2020, $627,625 and $5,000, respectively, was transferred from AKC Solutions Account 6241 to IMC Account 7700.

        b.     On or about May 15, 2020, $15,000 was transferred from AKC Solutions Account 6241 to Apiagne Account 7556.

        c.     On or about May 12 and May 13, 2020, $25,000 and $29,000, respectively, were transferred from AKC Solutions Account 6241 to IMC Account 7700.

        d.     On or about May 5, 2020, $10,000 in funds were transferred from Apiagne Account 7556 to KAMGAING Account 7640. On or about May 6, 2020, $10,000 in funds were transferred from KAMGAING Account 7640 to IMC Account 7700.

5

e.   On or about May 23, 2020, KAMGAING wrote check #1323 from Apiagne Account 7556 to himself for $500,000 with the memo "ITSM team comp." On that same date, KAMGAING deposited the $500,000 into KAMGAING Account 7640. Then, on or about May 28, 2020, KAIMGAING caused $500,000 to be transferred from KAMGAING Account 7640 to IMC Account 7700.

f.   On or about June 24, 2020, KAMGAING transferred a total of $800,000 from IMC Account 7700 to AKC Solutions Account 6241.

g.   On or about June 24, 2020, KAMGAING transferred $92,000 from KAMGAING Account 7640 to AKC Solutions Account 6241.

h.   Between on or about June 24, 2020 and July 22, 2020, KAMGAING transferred $114,054.50 from Apiagne Account 7556 to IMC Account 7T50.

i.   On or about June 25, 2020, KAMGAING wired $25,000 from Apiagne Account 7556 to real estate attorney D.C. for a down payment towards the purchase of real property at 215 Balfour Drive, Archdale, North Carolina ("Balfour Property").

j.   On or about June 26, 2020, KAMGAING transferred $100,000 from IMC Account 7700 to AKC Solutions Account 6241.

k.   On or about June 30, 2020, KAMGAING wired $846,737.73 from AKC Solutions Account 6241 to real estate attorney D.C. for the purchase of the Balfour Property. The Balfour Property was titled in the name of Apiagne.

## COUNT ONE
### (Wire Fraud in Relation to a Disaster Benefit)

25.    Paragraphs 1 through 24 of this Bill of Indictment are re-alleged and incorporated herein by reference as though fully set forth herein.

26.    From on or about April 7, 2020 through the date of the Indictment, in the Western District of North Carolina and elsewhere, the defendant,

### MAURICE KAMGAING

with the intent to defraud, did knowingly and intentionally devise the above-described scheme and artifice to defraud and to obtain money by materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire communication in interstate commerce any writing, signal, picture, and sound, *to wit*, electronic loan applications, wire transfers, and other electronic financial transactions in interstate commerce.

27.    The above-described scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations, and promises, occurred in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially-declared major disaster or emergency.

All in violation of Title 18, United States Code, Section 1343.

7

## COUNT TWO
### (False Statements to Bank)

28.    Paragraphs 1 through 24 of this Bill of Indictment are re-alleged and incorporated herein by reference as though fully set forth herein.

29.    On or about April 7, 2020, in the Western District of North Carolina and elsewhere, the defendant,

### MAURICE KAMGAING

did knowingly make a false statement with the intent to influence the actions of Bank 1, a financial institution, the accounts of which are insured by the FDIC, to wit, in the Bank 1 PPP Application for Apiagne, Inc., KAMGAING falsely represented that Apiagne, Inc. had 46 employees and an average monthly payroll of $260,000.

All in violation of Title 18, United States Code, Sections 1014.


## COUNT THREE
### (False Statements to Bank)

30.    Paragraphs 1 through 24 of this Bill of Indictment are re-alleged and incorporated herein by reference as though fully set forth herein.

31.    On or about April 27, 2020, in the Western District of North Carolina and elsewhere, the defendant,

### MAURICE KAMGAING

did knowingly make a false statement with the intent to influence the actions of Bank 1, a financial institution, the accounts of which are insured by the FDIC, to wit, in the Bank 1 PPP Application for AKC Solutions LLC, KAMGAING falsely represented that AKC Solutions LLC had 23 employees and an average monthly payroll of $260,000.

All in violation of Title 18, United States Code, Sections 1014.

8

## **COUNT FOUR**
(Engaging in Monetary Transactions in Criminally Derived Property)

32.    Paragraphs 1 through 24 of this Bill of Indictment are re-alleged and incorporated herein by reference as though fully set forth herein.

33.    On or about May 5, 2020, in the Western District of North Carolina and elsewhere, the defendant,

### **MAURICE KAMGIANG**

did knowingly engage and attempt to engage in a monetary transaction by, through and to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, money deposits which represented fraudulently obtained disaster-related loan proceeds, such property having been derived from a specified unlawful activity, that is, wire fraud and false statements to Bank 1, *to wit*, a withdrawal from AKC Solutions Account 6241 to IMC Account 7700 in the amount of $617,000.

All in violation of Title 18, United States Code, Section 1957.

## **COUNT FIVE**
(Engaging in Monetary Transactions in Criminally Derived Property)

34.    Paragraphs 1 through 24 of this Bill of Indictment are re-alleged and incorporated herein by reference as though fully set forth herein.

35.    On or about about May 23, 2020, in the Western District of North Carolina and elsewhere, the defendant,

### **MAURICE KAMGIANG**

did knowingly engage and attempt to engage in a monetary transaction by, through and to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, money deposits which represented fraudulently obtained disaster-related loan proceeds, such property having been derived from a specified unlawful activity, that is, wire fraud and false statements to Bank 1, *to wit*, a withdrawal from Apiagne Account 7556 in the amount of $500,000.

All in violation of Title 18, United States Code, Section 1957.

9

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

    a.    All property which constitutes or is derived from proceeds of the violations set forth in Counts One through Three of this Bill of Indictment;

    b.    All property involved in the violations set forth in Counts Four through Five; and

    c.    If, as set forth in 21 U.S.C. § 853(p), any property described in (a) or (b) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a) and (b).

The Grand Jury finds probable cause that the following property is subject to forfeiture on one or more of the grounds stated above:

    a.    A forfeiture money judgment in the amount of at least $1,506,463, such amount constituting the proceeds of the violations set forth in this Bill of Indictment;

    b.    All assets in Merrill Edge Account 7700 (identified elsewhere herein as IMC Account 7700), such account held in the name of Maurice Kamgaing;

    c.    All assets in Merrill Edge Account 7T50 (identified elsewhere herein as IMC Account 7T50), such account held in the name of Apiagne, Inc.; and

    d.    The real property at 215 Balfour Drive, Archdale, NC.

A TRUE BILL:



WILLIAM T. STETZER
ACTING UNITED STATES ATTORNEY

CARYN FINLEY
ASSISTANT UNITED STATES ATTORNEY

11